## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

DANIA PRUESS, MARY BATEMAN,
LINDA VARGAS MARTINEZ, and
DAVID GALLEGOS, *individually and*
*on behalf of all those similarly situated*,

        Plaintiffs,

v.                                  No. 1:19-cv-00629-DHU-JFR

PRESBYTERIAN HEALTH PLAN, INC.
and FLUENT HEALTH, LLC,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

This is a dispute over alleged misclassification of Care Coordinators ("CCs") and utilization review nurses ("UM Nurses") in New Mexico as exempt from the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA") and/or New Mexico Minimum Wage Act, N.M. Stat. Ann. § 50–4–22 ("MWA") overtime pay requirements. The Defendants are Presbyterian Health Plan, Inc. ("Presbyterian") and Fluent Health, LLC ("Fluent") (collectively, "Defendants").

Two motions are before the Court. First, Plaintiffs filed their Motion for Class Certification under Federal Rule of Civil Procedure 23 (Doc. 230) of a group of CCs under the MWA. Second, Defendants filed their Motion to Decertify Fair Labor Standards Act Conditional Collective (Doc. 233), in which they ask the Court to decertify a previously certified FLSA collective class. In response to Defendants' decertification motion, Plaintiffs ask the Court to subdivide the FLSA collective class. For the reasons below, Plaintiffs' motion to certify a Rule 23 class and request to subdivide a FLSA collective class are granted, and Defendants' motion is denied.

## I.    PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

### A. BACKGROUND[1]

Defendants administer health plans. Third Am. Compl. ¶ 1, Doc. 142. Since 2013, Presbyterian has contracted with the New Mexico Human Services Department ("HSD") to provide managed care services to patients enrolled in New Mexico's Medicaid program, known as Centennial Care. Doc. 230 at 10. Presbyterian and HSD operate under a contract called the Medicaid Managed Care Services Agreement (the "HSD Contract"). *Id*. Presbyterian hires several hundred CCs to perform the services under the HSD Contract. *Id*.; Evans Decl. ¶ 11, Doc. 233-1.[2] In addition to the HSD Contract, CCs are bound by secondary documents and agreements, including Presbyterian's Managed Care Policy Manual, HSD letters of direction and the HSD Systems Manual. Evans Depo., Doc. 231-7, 6.

CCs' job is to identify patients' needs, develop plans to address those needs, and coordinate across various providers to ensure that members get appropriate, cost-effective care. Evans Decl. ¶ 12. There are four levels of Care Coordinators: I, II, III, and IV. *Id.* ¶ 14. These levels correspond to a CCs' background, experience, and skill set. *Id.* Care Coordinators I, for example, coordinate care for patients with stable chronic conditions, like long-term diabetes. *Id.* ¶ 16. They are often assigned to patients who can self-manage their condition without much additional support, and therefore need fewer check-ins with a CC. *Id.* On the other end of the spectrum, a CC IV works with patients with more complex needs. *Id.* ¶ 17. For example, a CC IV may work with a member

---

[1] The Court accepts as true Plaintiffs' allegations and evidence for purposes of ruling on their class certification motion. *See Black v. Occidental Petroleum Corp.*, 69 F.4th 1161, 1169 n.1 (10th Cir. 2023); *Vallario v. Vandehey*, 554 F.3d 1259, 1265 (10th Cir. 2009).

[2] Eric L. Evans is Presbyterian's Vice President of Health Services and Defendants' Federal Rule of Civil Procedure 30(b)(6) witness.

who has acute, complex medical needs such as a traumatic brain injury or a patient needing a transplant. *Id*.

CCs' work corresponds to their educational training and professional licenses. *Id*. For example, a person can be hired as a CC I with three years of relevant experience and a high school diploma. *Id*. But a person cannot be hired as a CC IV without a master's degree and four years of relevant experience or a different degree and several years of additional years of experience. *Id*.

In addition, CCs are assigned to "Specialty Teams." *Id.* ¶ 19. Those specialty teams include a Maternal Child Team that focuses on pregnant women and children, a Transplant Team that coordinates organ transplants, a Transition-of-Care Team that assists individuals with hospital discharges, and several other teams. *Id.* CCs are hired to work on specialty teams, or transfer to those teams internally, in part because of their professional education and experience. *Id.* For example, the Maternal Child Team is largely nurses with relevant experience. *Id*.

Other CCs develop individual specialties and serve as consulting subject-matter experts on specific issues. *Id.* ¶ 20. For example, Presbyterian has CCs who are specialized in behavioral health, traumatic brain injury, and other specialties. *Id*. Some of these CC also work with subsets of patients in the Justice Involved, Medically Fragile, Complex Behavioral Needs, High-Risk Maternity, and Comprehensive Addiction Recovery Act patient populations. *Id*. CCs with these specialties provide specific guidance to specific patient populations. *Id*.

Regardless of a CC's title, they have similar duties: (1) administering Comprehensive Needs Assessment ("CNA") questionnaire to a patient[3]; (2) compiling care plans ("Care Plans")

---

[3] Defendants argue that conducting a CNA was not a uniform job duty. They cite, among other things, a summary of CCs' job duties on nine different Specialty Teams. The summary indicates that CCs on three of those teams—Critical Incidents, Dual Special Needs Program ("DSNP") Level I, and Transition of Care—do not perform CNAs. Doc. 233-4. But Plaintiff have since specifically excluded CCs from those three teams from their proffered class definition, so the Court

using the patient's answer to the CNA; and (3) completing telephonic and in-person follow-up assessments ("Touchpoints"). *See*, *e.g.*, Evans Depo., Doc. 231-7 at 6; Falance Depo., Doc. 231-8, 3-4; Baros Depo., Doc. 231-9, 6; Gonzales Depo. 231-18, 4 (CC I describing job duties); Corbin Decl. ¶ 4, Doc. 231-30; (CC II describing job duties); Atencio Decl. ¶ 4, Doc. 231-29 (CC III describing job duties); Flores Decl. ¶ 4, Doc. 231-32 (CC IV describing job duties).

These three duties—administering CNAs, compiling Care Plans, and conducting Touchpoints—are referred to in these proceedings as "CC Deliverables." CCs attested that most of their time is spent working on CC Deliverables. *See*, *e.g.*, Calix-Garcia Depo., Doc. 231-14, 9-10 (80%); Hernandez Depo., Doc. 231-19 (85%); Atencio Decl. ¶ 16 (85-80%); Corbin Decl. ¶ 17 (95%); Flores Decl. ¶ 17 (95%). The Court will describe these three duties in more detail below, starting with the CNA.

A CC's work begins with an in-person assessment of a patient. Evans Decl. ¶ 13. CCs use a standardized, HSD-approved CNA questionnaire to collect and record information, including patients' pre-diagnosed medical conditions. Evans Depo., Doc. 231-7 at 7-8; Atencio Depo., Doc. 231-12, 7. The CNA is not a "nursing assessment"; CCs do no provide direct medical care or nursing care. Evans Depo., Doc. 231-7 at 13, 22. The CNA Questionnaire consists mostly of multiple choice, "Yes" or "No," and fill-in-the-blank questions. Herrera Decl. ¶ 10, Doc. 231-31. CCs "simply ask[] the [patient] the questions on the CNA Questionnaire and enter[] the [patient]'s

---

places little to no weight on Defendants' argument that conducting a CNA was not a uniform job duty for the remaining CCs. Aside from the summary chart, Defendants also rely on a declaration from a CC in the Transplant team who stated that she does not conduct CNAs, and a declaration from a former Level I CC who likewise stated that she did not conduct CNAs on nursing facility patients. *See* Barnard Decl. ¶ 21, Doc. 245-16; Nielsen Decl. ¶ 16, Doc. 245-17. These two declarations certainly suggest that the declarants themselves did not conduct CNAs. However, the preponderance of Plaintiffs' evidence amply supports Plaintiffs' argument that CCs generally conducted CNAs, notwithstanding the two declarations that Defendants rely upon.

answers into [Presbyterian]'s software by filling in the blank fields and drop-down boxes." *Id*. If a patient answers "yes" to having diabetes, for example, the CNA generates a list of follow-up questions relating to that issue. Evans Depo., Doc. 231-7 at 9. CCs rarely, if ever, ask a patient a question that are not on the face of the CNA Questionnaire. Herrera Decl. ¶ 10.

While Presbyterian uses different CNA tools for different patient populations (for example, there are CNA tools for pediatric patients, adolescent patients, and pregnant patients), Presbyterian requires CCs to use a CNA tool for every CNA they produce. Evans Depo., Doc. 231-7 at 8. All CCs use a CNA tool, regardless of the individual's job title. *Id*. CCs have no discretion on how to put information into the CNA. Bateman Depo., Doc. 231-13, 7.

After a CC uploads a patient's CNA answers, Presbyterian's case management system automatically generates a Care Plan Template with prepopulated goals and other information based on the patient's CNA responses. Doc. 231-6; Wiltgen Depo., Doc. 231-28, 5; Herrera Decl. ¶ 11; Flores Decl. ¶ 11; Olloway Decl., ¶ 8, Doc. 231-35; Rodriguez Decl. ¶ 11, Doc. 231-26. Based on responses to the CNA, a clinical algorithm categorizes the patient into the appropriate level of care coordination—level one, two or three. Doc. 232-1, 10; Bateman Depo., Doc. 231-13 at 4. CCs do not determine patients' assigned level of care. Herrera Decl. ¶ 12; Flores Decl. ¶ 12; Olloway Decl., ¶ 10.

After completing the CNA and Care Plan, CCs are required to complete Touchpoints, or follow-ups. To do a telephonic Touchpoint, CCs call the patient and ask the person pre-populated questions provided in specific assessment templates in Presbyterian's software. Herrera Decl. ¶ 13. CCs then document the individual's answers to these questions in Presbyterian's software. *Id.*

In performing their duties, CCs must produce CC Deliverables in the same timeframe. Evans Depo., Doc. 231-7 at 15; Herrera Decl. ¶ 4. For example, CCs must perform the CNA within

30 days of a patient's completion of an initial exam, and then prepare the Care Plan within 14 days after the CNA is completed. Evans Depo., Doc. 231-7 at 7. CCs must then perform computer-generated Touchpoints. Gallegos Depo., Doc. 231-17, 7.

CCs are also subject to the same supervision and auditing standards. Presbyterian is required to ensure that "[c]are coordination tools and protocols are consistently and objectively applied," that "CNAs and reassessment[s] … occur on schedule" under the HSD Contract, and that Care Plans are "developed and updated on schedule and in compliance with" the HSD Contract. HSD Contract, Doc. 231-1, 32.

Presbyterian "constantly track[s], capture[s] and monitor[s]" whether CCs "produce[ ] CC Deliverables correctly and on schedule." Atencio Decl. ¶ 18. Presbyterian "also monitor[s] the timeliness of [CCs'] work by requiring [them] to attend regular one-on-one meetings with [their] supervisors to discuss the results of production audits of [their] work." *Id.* During these meetings, supervisors make clear that "failing to meet production timeframes for CC Deliverables would result in poor audit scores, which would result in discipline, up to and including termination." Corbin Decl. ¶ 19. Presbyterian monitors the CNAs, Care Plans, and Touchpoints. Evans Depo., Doc. 231-7 at 30, 31.

All CCs receive the same initial and ongoing training. Regardless of a CC's title or patient population, all CCs must attend an initial orientation that includes standardized on-boarding information and training on how to prepare CC Deliverables. *Id.* at 34, 35, 36, 37; Ingram Depo., Doc. 231-11, 4. In addition to new-hire training, the HSD Contract also mandates that Presbyterian provide ongoing training to CCs. HSD Contract, Doc. 231-1 at 30. This includes mandatory monthly meetings which all Care Coordinators are required to attend, regardless of their job title. Evans Depo., Doc. 231-7 at 27.

Presbyterian considers CCs "front line staff". *Id*. at 16. They are not part of "leadership huddles" where managers discuss operational practices. Evans Depo., Doc. 231-7 at 17. They do not develop or create policies or develop operational practices. *Id*. at 15-16. They do not supervise other Presbyterian or HSD employees. *Id*. at 17. They do not provide public relations or human resources services, computer services, employee benefit functions, quality control, or marketing or advertising services. Falance Depo., Doc. 231-8 at 6-7. They have little, if any, communication with HSD. Atencio Decl. ¶ 20; Corbin Decl. ¶ 19; Herrera Decl. ¶ 22; Flores Decl. ¶ 22; Olloway Decl., ¶ 10.

CCs do not provide direct medical or care, order or modify medical treatments, or physically touch patients. Evans Depo., Doc. 231-7 at 13-14. CCs across different levels attested as follows about the limits of their job duties:

> My duties as a Care Coordinator did not involve exercising clinical judgment or interpreting medical records. I did not provide nursing care in a clinical setting or provide any direct medical care to Members.[4] I did not have the authority to order medical treatment for Members or the authority to suspend or modify orders from Members' physicians. My job duties did not involve physically touching members, diagnosing Members, treating Members, or providing clinical care. Nor did my job duties involve recommending courses of treatment for Members, recommending specific doctors to Members, or consulting with doctors to produce CNAs or Care Plans. While PHP's software required me to document a call made to the Member's primary care physician, I rarely, if ever, spoke with a Member's doctor.

Herrera Decl. ¶ 5; *see also* Flores Decl. ¶ 5; Olloway Decl., ¶ 13.

Since the job was first created in 2013, Presbyterian has paid CCs at the II, III and IV positions on a salary basis and classified them as exempt employees for MWA and FLSA purposes. Doc. 230 at 23. Before June 3, 2018, Presbyterian paid CC I employees on an hourly basis and

---

[4] "Member" means patient.

7

classified them as non-exempt. *Id*. Since June 2018, Presbyterian has allegedly classified all CCs as exempt employees and paid them on a salary basis, regardless of job title. *Id*.

## B. PROCEDURAL BACKGROUND

This action was originally brought on July 11, 2019, by a single plaintiff, Dania Pruess, as a putative class and collective action under the MWA and the FLSA. Compl., Doc. 1. Pruess, a former UM Nurse sought to represent (collectively and as a Rule 23 representative), a class of Care Coordination Employees. *Id*. ¶¶ 54, 65. In a later filed amended complaint, Plaintiff Mary Bateman, a former CC IV, joined Plaintiff Pruess as a second Named Plaintiff. First Am. Compl., Doc. 13.

As originally pled, the putative class and collective encompassed more than just workers with the CC title. The class also included UM Nurses and Long-Term Care Utilization Reviewers ("LTC Reviewers"). *Id*. ¶¶ 5, 117. It also included CCs on the Transition of Care, Critical Incidents, and DNSP Level I teams. *Id*.

Plaintiffs initially moved for conditional class certification of the FLSA collective. Doc. 16. Relying on Plaintiffs' original class definition, the Court preliminarily certified a FLSA collective in November 2020. Doc. 47. Plaintiffs' counsel sent notices to 723 current and former Presbyterian employees. Doc. 245 at 19. Seventy-one of those recipients opted to join the lawsuit, with two, Linda Vargas Martinez and David Gallegos, joining as Named Plaintiffs. *Id*.

Plaintiffs filed their operative Third Amended Complaint that named additional plaintiffs and defendants. Third Am. Compl., Doc. 142. In their operative complaint, Plaintiffs seek to proceed as a FLSA collective action (Count 1); an MWA class of Plaintiff Pruess and "Utilization Management Class" employees (Count 2); and an MWA class composed of Plaintiffs Bateman, Martinez, Gallegos, and Care Coordinator employees (Count 3). *Id.* at 31-36.

In the instant motion, Plaintiffs move for class certification of their MWA claim pursuant to Rule 23 of the Federal Rules of Civil Procedure. Although Plaintiffs' operative complaint contemplates two classes—a Utilization Management Class (Count 2) and a CC Class (Count 3)—Plaintiffs are presently only moving for Rule 23 certification of the CC Class. Doc. 230 at n.1.

Plaintiffs proffer a class definition of:

> All current and former Care Coordinators employed by Defendants in New Mexico who performed work pursuant to Defendant Presbyterian Health Plan, Inc.'s contract with the New Mexico Human Services Department from February 1, 2013, to the final date of judgment (the "Class"). The terms "Care Coordinators" or "CCs" refer to individuals employed by Defendants in the Care Coordinator I, Care Coordinator II, Care Coordinator III, or Care Coordinator IV positions in New Mexico who were paid on a salary basis, but does not include individuals employed as Care Coordinators on Defendants' Transition of Care team, Critical Incident team, or DSNP Level 1 Care Coordinators.

*Id.* at 24 (bold font omitted). Plaintiffs estimate about 700 individuals are in the proposed class.

In their answer, Defendants raised the "administrative and/or professional" exemptions under FLSA and MWA. Doc. 155, 23. Plaintiffs moved to strike the professional exemption as an affirmative defense because Defendants waived the defense, which the Court granted. Doc. 278. Plaintiffs' Rule 23 motion only addresses the administrative exemption. Doc. 230 at n.99.

## C. LEGAL STANDARDS

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348, 131 S. Ct. 2541, 2550, 180 L. Ed. 2d 374 (2011) (citation and quotation omitted). Plaintiffs claim that their proposed class action may be certified under Rule 23(b)(3) of the Federal Rules of Civil Procedure. As such, Plaintiffs must "show that the underlying case (1) satisfies each of Rule 23(a)'s prerequisites, and (2) falls under at least one of Rule 23(b)'s categories of class actions." *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 913 (10th Cir. 2018).

### 1. Rule 23(a) Prerequisites

Rule 23(a) of the Federal Rules of Civil Procedure provides that a class may be certified only if four prerequisites have been met: numerosity, commonality, typicality, and adequacy of representation. *See Dukes*, 564 U.S. at 349. The Rule provides as follows:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These requirements "do[] not set forth a mere pleading standard. A party seeking class certification must ... be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Dukes,* 564 U.S. at 350. "Further, the district court has an independent obligation to conduct a rigorous analysis before concluding that Rule 23's requirements have been satisfied. Often that analysis requires looking at the merits of a plaintiff's claims." *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1217 (10th Cir. 2013) (citation and quotation marks omitted). This "rigorous analysis" may require the resolution of factual disputes "through findings, regardless of whether these findings necessarily overlap with issues on the merits." *Vallario*, 554 F.3d at 1267 (citation and quotation marks omitted).

### 2. Rule 23(b)(3) Requirements

If the requirements of Rule 23(a) are satisfied, a class action may proceed under Rule 23(b)(3) of the Federal Rules of Civil Procedure only if a plaintiff can satisfy two additional requirements—predominance and superiority. *See Brayman v. KeyPoint Gov't Sols., Inc.*, 83 F.4th

823, 837 (10th Cir. 2023). Specifically, a class may be certified only if the district court determines

as follows:

> [T]he questions of law or fact common to class members predominate over any
> questions affecting only individual members, and that a class action is superior to
> other available methods for fairly and efficiently adjudicating the controversy. The
> matters pertinent to these findings include:
> (A) the class members' interests in individually controlling the prosecution or
> defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun
> by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in
> the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

With respect to common issues, Rule 23(b)(3) imposes a "far more demanding" inquiry

into the common issues which serve as the basis for class certification. *Amchem Prod., Inc. v.*

*Windsor*, 521 U.S. 591, 624, 117 S. Ct. 2231, 2250, 138 L. Ed. 2d 689 (1997). "To satisfy Rule

23(b)(3), a plaintiff must 'show that common questions subject to generalized, classwide proof

*predominate* over individual questions.'" *Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d

779, 789 (10th Cir. 2019) (quoting *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076,

1087 (10th Cir. 2014)). While the inquiry may be more demanding, Rule 23(b)(3) "does *not* require

a plaintiff seeking class certification to prove that each elemen[t] of [her] claim [is] susceptible to

classwide proof." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 469, 133 S.

Ct. 1184, 1196, 185 L. Ed. 2d 308 (2013) (quotation omitted) (alterations in original). Rather, all

that is required is that a class plaintiff show that "common questions 'predominate.'" *Id.* (quoting

Fed. R. Civ. P. 23(b)(3)). "[T]his doesn't mean a plaintiff must show that all of the elements of the

claim entail questions of fact and law that are common to the class" or "that the answers to those

common questions [are] dispositive" of the claim. *Naylor Farms*, 923 F.3d at 789 (citation omitted).

Finally, the district court must determine that class certification is the superior method for adjudicating these claims. *See* Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) lists four factors—individual control of litigation, prior actions involving the parties, the desirability of the forum, and manageability—which courts should consider in making these determinations. Fed. R. Civ. P. 23(b)(3)(A)–(D). The party seeking class certification bears the burden of proving Rule 23's requirements are satisfied. *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010).

## D. DISCUSSION

The question presented is whether class action certification of CCs in New Mexico challenging their administrative exemption status under the MWA is appropriate under Federal Rule of Civil Procedure 23. For the reasons stated below, the Court determines the answer is yes.

### 1. Rule 23(a) Analysis

As noted earlier, Rule 23(a) has four prerequisites: numerosity, commonality, typicality, and adequacy of representation. *See Dukes*, 564 U.S. at 349. Plaintiffs argue that they satisfy all four requirements. Defendants only dispute (1) commonality and (2) adequacy of representation. The Court therefore limits its analysis to these two prerequisites; the Court does not address or decide numerosity and typicality. As explained more fully below, the Court concludes that Plaintiffs have demonstrated the putative class shares at least one common question of law or fact, the resolution of which will drive the litigation. The Court further concludes that Plaintiffs and their counsel will be adequate representatives.

### A) Commonality

Concerning the commonality prerequisite under Rule 23(a), a plaintiff must "demonstrate that the class members have suffered the same injury. This does not mean merely that they have all suffered a violation of the same provision of law." *Dukes,* 564 U.S. at 350 (citation and quotation omitted). A plaintiff's claims "must depend upon a common contention" and "[t]hat common contention, moreover, must be of such a nature that it is capable of classwide resolution— which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "In other words, the focus of Rule 23(a)(2)'s commonality requirement is not so much on whether there exist common *questions*, but rather on 'the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" *Naylor Farms*, 923 F.3d at 789 (quoting *Dukes* 564 U.S. at 350).

The existence of a single common question is sufficient to meet the commonality requirement. *Brayman*, 83 F.4th at 837; *Menocal*, 882 F.3d at 914 ("A finding of commonality requires only a single question of law or fact common to the entire class."). Importantly, commonality does "not require that every member of the class share a fact situation *identical* to that of the named plaintiff." *Colorado Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1216 (10th Cir. 2014) (emphasis in original).

Plaintiffs propose six common questions of law or fact in their motion for class certification:

> (1) whether Care Coordinators produce the services that Presbyterian sells to its customers; (2) whether Care Coordinators' job duties are governed by the customer contract and are performed pursuant to Presbyterian's corporate policies; … (3) whether Care Coordinators were not paid overtime wages when they worked more than forty (40) hours a week. … ([4]) whether Care Coordinators' primary job duties directly relate to Presbyterian's management or general business operations; ([5]) whether Care Coordinators exercise discretion and independent judgment with

respect to matters of significance; and ([6]) whether Care Coordinators are covered by the overtime requirements of the MWA.

Doc. 230 at 30.

The Court concludes that Plaintiffs have met Rule 23(a)'s commonality prerequisite. The commonality analysis considers "whether the challenged policy is common to the class as a whole, and whether the proposed class members share similar job duties." *Felps v. Mewbourne Oil Co., Inc.*, 336 F.R.D. 664, 670–71 (D.N.M. 2020) (quoting *Gandy v. RWLS, LLC*, 17-cv-558, 2019 WL 1407214, at *6 (D.N.M. Mar. 28, 2019)). Plaintiffs have shown the challenged policy is common to the class as a whole because they have shown that CCs were subject to the same classification policy that resulted in their alleged employment violation. Here, "the common contention of the class members … is that they were not properly compensated for overtime hours because [d]efendants misclassified them as exempt from the NMMWA's overtime requirements," commonality is generally met. *Id.* a 672; *see also Golden v. Quality Life Servs., LLC*, No. CV 22-579 GJF/GBW, 2023 WL 3182645, at *6 (D.N.M. Apr. 30, 2023) ("Misclassification cases involving a policy categorically applied to the entire class typically present a common question because the central question of whether employees were wrongfully classified as exempt from overtime pay requirements unites them.") (quotation omitted). Plaintiffs have therefore shown the challenged policy is common to the class, which is a common question. *See id.* at *8 (finding commonality met for MWA class where the employees were subjected to the same classification scheme); *Felps*, 336 F.R.D. at 671 (same); *Rodriguez v. Peak Pressure Control, L.L.C.*, No. 217CV00576JCHJFR, 2020 WL 3000415, at *7 (D.N.M. June 4, 2020) (same).

The putative class members also have similar job duties. Commonality does not require Plaintiffs to show "that class members perform identical duties—an impossible task." *Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408, 415 (S.D.N.Y. 2013) (quotation omitted). Rather, the

14

Plaintiffs' job duties must be "largely consistent." *Rodriguez*, 2020 WL 3000415, at *7; *Jacob*, 289 F.R.D. at 415 (to find commonality "the putative class members must have largely consistent duties").

Plaintiffs' evidence meets this standard. For example, CCs at all levels attested generally as follows:

> As a Care Coordinator, I produced CNAs and Care Plans for Members assigned to my caseload. I did not choose the Members assigned to my caseload, but instead had members assigned to me through PHP's queue. The queue assigned Members to my caseload based on my geographic region, not based on the Members' medical conditions.

> After the queue assigned a Member to my caseload, PHP required me to produce a CNA for the Member. … To produce the CNA, I had to go through the CNA Questionnaire with the Member. The CNA Questionnaire consisted primarily of multiple choice, "Yes" or "No," and fill-in-the-blank questions. I simply asked the Member the questions on the CNA Questionnaire and entered the Member's answers into PHP's software by filling in the blank fields and drop-down boxes. I rarely, if ever, asked a Member questions that were not on the face of the CNA Questionnaire.

> After I entered the Member's answers to the CNA Questionnaire into PHP's software, the software generated a Care Plan template for that Member. It was my job to insert information from the CNA into drop-down boxes in PHP's Care Plan template.

> After I filled out the CNA and Care Plan, PHP required me to produce regular Touchpoints for the Member within contractually mandated deadlines. To produce a Touchpoint, I either called the Member or visited the Member and asked him or her questions provided in specific assessment templates in PHP's software. I then documented the Member's answers to these questions in PHP's software by either typing in the answers or selecting from multiple choice options.

Atencio Decl. ¶¶ 9-12; *see also* Corbin Decl. ¶¶ 9-11; Herrera Decl. ¶¶ 9-13; Flores Decl. ¶¶ 9-13; Larrichio Decl. ¶¶ 4-9, Doc. 231-33; Montano Decl. ¶¶ 9-12, Doc. 231-34, Olloway Decl. ¶¶ 4-9; Rodriguez Decl. ¶¶ 9-11.

Based on the declarations and other evidence, the Court holds that the Plaintiffs "share the same baseline job responsibilities, which is a common element of proof." *Rodriguez*, 2020 WL

3000415, at *7 (finding commonality met where declarations from 38 pressure control workers showed class members' job duties were largely consistent); *Golden*, 2023 WL 3182645, at *7-8 (finding commonality met where declarations from five home health care workers detailed similar job duties).

In arguing against commonality, Defendants argue that CCs' job duties vary immensely. They say that "even class members who carried the same title describe performing different job duties or performing the job duties they had in common in different ways and with different amounts of discretion." Doc. 245 at 22. But whether Plaintiffs' "baseline responsibilities require a degree of individualized proof that defeats the similarities of the common questions ... is a question best suited for the predominance inquiry," of Rule 23(b)(3), which the Court will address later. *Jacob*, 289 F.R.D. at 415–16.

In summary, Plaintiffs have met Rule 23(a)'s commonality prerequisite.

### B) Adequacy of Representation

The next disputed Rule 23(a) prerequisite is adequacy of representation. Federal Rule of Civil Procedure 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." "The inquiry into whether a class representative can protect the class's interest 'serves to uncover conflicts of interest between named parties and the class they seek to represent.'" *Tennille v. W. Union Co.*, 785 F.3d 422, 430 (10th Cir. 2015) (quoting *Amchem Prods.*, 521 U.S. at 625)). "In order to protect the class's interest adequately and fairly, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* (internal quotation marks and citation omitted). "Resolution of … two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel

prosecute the action vigorously on behalf of the class?" *Rutter & Wilbanks Corp. v. Shell Oil Co.,* 314 F.3d 1180, 1187 (10th Cir. 2002) (citation omitted).

### i. Vigorous Prosecution

Starting with the second question—vigorous prosecution on behalf of the class— Defendants argue that Plaintiffs' counsel has "abandoned" the MWA claims of certain clients by narrowing the class definition to exclude UM Nurses, LTC Reviewers, and certain CCs. Doc. 245 at 39. According to Defendants, once the 64 individual FLSA Plaintiffs opted-in, an attorney-client relationship existed between these individuals and class counsel. Despite the existence an attorney-client relationship, Plaintiffs' counsel allegedly "discarded those clients MWA claims to present … a stronger case for certification" by narrowing the class. *Id*. Defendants also point out that the new class also excludes the original Named Plaintiff, Dania Pruess.

Defendants further argue that these individuals' pending FLSA claims do not fix the situation because the FLSA is an inferior cause of action compared to the MWA.[5] Also, some of these individuals may lose their right to bring a MWA claim entirely, according to Defendants, because "dropping those workers from the class definition means that their MWA claims are no longer tolled". *Id*. at 41. So by allegedly abandoning the MWA claims of UM Nurses, LTC Reviewers, and DNSP Level I CCs, those individuals are now "in a markedly worse position." *Id.* Defendants therefore argue that that "Plaintiffs' counsel has shown that they are not willing to vigorously pursue the claims of the [FLSA] opt-in members whose MWA claims they have abandoned." *Id*. at 42.

---

[5] The FLSA's statute of limitations is shorter than the MWA, *compare* 29 U.S.C. § 255(a), *with* N.M. Stat. Ann. §§ 37–1–5, 50–4–32, and the MWA allows for treble damages whereas the FLSA only allows for double damages, *compare* 29 U.S.C. §§ 216(b), 260, *with* N.M. Stat. Ann. § 50–4–26(C).

The Court is not persuaded by Defendants' arguments. First, as a general proposition, "[l]itigants and judges regularly modify class definitions[.]" *Schorsch v. Hewlett-Packard Co.*, 417 F.3d 748, 750 (7th Cir. 2005). "If the evidence calls into question the propriety of defining a class in a particular way, then the definition must be modified or subclasses certified." *Fonder v. Sheriff of Kankakee Cnty.*, 823 F.3d 1144, 1147 (7th Cir. 2016). Plaintiffs acknowledge that they narrowed the class definition as discovery progressed and revealed that UM Nurses, LTC Reviewers, DNSP Level I CCs, and CCs on the Transition of Care and Critical Incident Teams perform different job duties than class members. It was therefore reasonable for Plaintiffs to narrow the class definition to exclude those job positions. *See McBean v. City of New York*, 228 F.R.D. 487, 498 (S.D.N.Y. 2005) (rejecting the argument that the "plaintiffs' decision to narrow the class in order to obtain relief for a subset of the original plaintiffs, while leaving unimpaired the rights of those excluded to pursue their claims separately, in any way demonstrates their inadequacy or that of counsel"). The Court holds that the Plaintiffs and their counsel will vigorously prosecute the action on behalf of the class.

### ii. Conflicts of Interest

The next question is whether the "named plaintiffs and their counsel have any conflicts of interest with other class members." *Rutter & Wilbanks,* 314 F.3d at 1187. Defendants argue that two "[i]rreconcilable conflicts" exist between Plaintiffs and their counsel and the absent class members. Doc. 245 at 42.

First, Defendants argue that "[a] fundamental conflict exists where some members of the class claim harm through a representative plaintiff's conduct that resulted in benefit to other class members." *Id.* (quoting *Eatinger v. BP Am. Prod. Co.*, 271 F.R.D. 253, 260 (D. Kan. 2010)). According to Defendants, class counsels' narrowing of the class benefits the putative class because

18

it makes class certification more likely, "[b]ut it also harms the excluded workers—some of whom have attorney-client relationships with Plaintiffs' counsel—by making it more difficult to pursue … their state-law claims." *Id.*

But this argument is unpersuasive because, as Plaintiffs correctly note, "the relevant inquiry is whether the named plaintiffs and their counsel have any conflicts of interest with the *other class members*." Doc. 249 at 21 (citing *Rutter & Wilbanks,* 314 F.3d at 1187). The FLSA opt-in plaintiffs are not included in Plaintiffs' proposed class. Because they are not members of the proposed class, their interests are not "antagonistic to, or in conflict with," the interests of the putative class members. *Albertson's, Inc. v. Amalgamated Sugar Co.*, 503 F.2d 459, 463 (10th Cir. 1974). Defendants' focus on the alleged uneven benefit between the FLSA opt-in plaintiffs and the Rule 23 class is therefore misplaced.

Second, Defendants argue that some putative class members prefer their status as salaried workers, which creates a conflict of interest between Plaintiffs and absent class members. In support, Defendants submitted similar declarations from three putative class members. For example, one employee attested, "[i]f I had the option between salary and hourly, I'd prefer to be salary because it's reliable[.]" Gonzales Decl. ¶ 9, Doc. 245-15; *see also* Stover Decl. ¶ 32, Doc. 245-15 ("If given the option of switching to hourly, I would not take it. I'd prefer to be a salar[ied] employee. Clocking in and clocking out would be a hassle and mean extra paperwork and less flexibility in how I manage my time."); Barnard Decl. ¶ 32, Doc. 245-16 ("[H]aving the flexibility of being salaried and working from home makes this a great job for me. I love the way things are, and I don't want anything about it to change."); Montoya Depo. 83:8-20, Doc. 233-27.

Concerning Defendants' declarations, "[m]any courts have expressed skepticism about the use of … 'happy camper' declarations to defeat a motion for class certification in wage and hour

cases." *Nash v. Horizon Freight Sys., Inc.*, No. 19-CV-01883-VC, 2020 WL 7640878, at *1 (N.D. Cal. Dec. 23, 2020) (collecting cases). As the court explained in the context of a classification case over whether workers were "employees" or "independent contractors,"

> Beyond the fact that happy camper declarations are submitted by companies with potentially significant influence over the workers who sign them, there is a further concern that the declarants are relying on incomplete, or even false, information. The typical happy camper declarations, including the ones in this case, imply that workers want to remain independent contractors for the purpose of preserving their schedule flexibility. But nothing in [state] law prevents companies like [the defendant] from providing the exact same scheduling flexibility for "employees" as they provide to "independent contractors." … Despite this, companies often make misleading statements to the contrary, suggesting (including to their workers) that the change in classification will require eliminating flexibility. … This is another reason to be suspicious of these sorts of declarations, submitted by companies claiming their workers are not misclassified and want to preserve their independent status.

*Id.*, at *2 (citations omitted).

The Court agrees with this reasoning and views with suspicion the three alleged "happy camper" declarations given Defendants' apparent interest in preserving its classification regime. Beyond these three declarations, that leaves the deposition testimony of Ms. Montoya, who made similar statements that she preferred being a salaried employee. But Ms. Montoya is no longer even a member of the class, so her testimony is entitled to little, if any, weight. The Court concludes the declarations by class members purporting to embrace their status as salaried employees do not create a conflict of interest.

Finally, the Court finds that Mr. Douglas Werman's declaration (Doc. 231-41) satisfies the adequacy determination under Rule 23(a). In considering the factors under Fed. R. Civ. P. 23(g)(1),[6] the Court concludes that Werman Salas P.C. (Sarah Arendt, Maureen Salas, and Douglas

---

[6] Under Rule 23(g)(1), "a court that certifies a class must appoint class counsel. In appointing class counsel, the court must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex

Werman) will be appointed as class counsel. Werman Salas is a national law firm focused on labor and employment class and collective actions, privacy litigation, and consumer class actions. Doc. 231-41 at 11. Other courts have found Mr. Werman adequate class counsel. *See Schmidt v. Smith & Wollensky, LLC*, 268 F.R.D. 323, 328 n.5 (N.D. Ill. 2010) ("Plaintiff's counsel is qualified to serve as class counsel in the pending litigation because they are highly experienced attorneys and have acted as class counsel in similar actions in federal and state courts."). It appears that Werman Salas has identified and investigated potential claims, and nothing indicates the firm lacks the resources to represent the class.

In summary, Plaintiffs have met the adequacy requirement and satisfied all the Rule 23(a) prerequisites for class certification.

## 2. Rule 23(b) Analysis

The Court now moves onto the Rule 23(b) analysis. Defendants argue that Plaintiffs fail to satisfy the two additional Rule 23(b)(3) requirements—predominance and superiority—necessitating the Court's analysis of these two elements.

### A) Predominance

"Rule 23(b)(3)'s predominance requirement regularly presents the greatest obstacle to class certification." *Menocal*, 882 F.3d at 918. In analyzing the predominance requirement, "[c]ourts conduct a two-step analysis." *Brayman*, 83 F.4th at 838. "First, for every issue related to the claim, the court must characterize it as common or individual." *Id*.; *Naylor Farms*, 923 F.3d at 789 ("to determine whether a plaintiff can satisfy Rule 23(b)(3)'s predominance requirement, a court must first *characterize* the issues in the case as common or not") (emphasis in original). This inquiry

---

litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A).

necessarily involves an analysis of the elements of the class's underlying cause of action. *Menocal*, 882 F.3d at 926 n.17.

In conducting this analysis, the court "consider[s] ... how the class intends to answer factual and legal questions to prove its claim—and the extent to which the evidence needed to do so is common or individual." *Id.* at 915. "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453, 136 S.Ct. 1036, 194 L.Ed.2d 124 (2016) (brackets and quotation omitted).

Once the district court has identified the elements, the second step requires the court to "weigh the issues to determine whether the common issues predominate." *Brayman*, 83 F.4th at 838; *see also CGC Holding Co*, 773 F.3d at 1087 (noting that the Rule 23(b)(3) analysis requires the court "to survey the elements of the class's … claims to consider (1) which of those elements are susceptible to generalized proof, and (2) whether those that are so susceptible predominate over those that are not"). But "[i]t is not necessary for a plaintiff to show that all of the elements of the claim entail questions of fact and law that are common to the class [or] that the answers to those common questions [are] dispositive." *Brayman*, 83 F.4th at 838 (quotation marks omitted). "Critically, so long as at least one common issue predominates, a plaintiff can satisfy Rule 23(b)(3)—even if there remain individual issues, such as damages, that must be tried separately." *Naylor Farms*, 23 F.3d at 789.

Defendants contend that three class issues are not susceptible to generalized proof: (i) the MWA's administrative exemption, (ii) Defendants' alleged liability and (iii) damages. The Court analyzes each argument.

### i. The MWA and the Administrative Exemption

The Court first provides some contextual background on the MWA. New Mexico's minimum wage provision provides that "[a]n employee shall not be required to work more than forty hours in any week of seven days, unless the employee is paid one and one-half times the employee's regular hourly rate of pay for all hours worked in excess of forty hours." N.M. Stat. Ann. § 50–4–22(D). The MWA, however, exempts individuals "employed in a bona fide executive, administrative or professional capacity and forepersons, superintendents and supervisors" because such individuals do not fall within the MWA's definition of "employee." N.M. Stat. Ann. § 50–4–21(C); *Williams v. Mann*, 388 P.3d 295, 305 (N.M. Ct. App. 2017).

In considering whether a worker is qualified as an exempt administrative employee, New Mexico courts look to federal law. *See Valentine v. Bank of Albuquerque*, 102 N.M. 489, 490, 697 P.2d 489, 490 (N.M. 1985); *Williams*, 388 P.3d at 305. Federal regulations classify employees as "administrative" if (1) they are "[c]ompensated on a salary basis," (2) their "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and (3) their "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a).[7]

The second prong of § 541.200, whether the employee's primary duty is directly related to management, requires consideration of whether the employee "perform[s] work directly related to assisting with the running or servicing of the business, as distinguished ... from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). As for the third prong, the phrase "exercise of discretion and independent judgment"

---

[7] The parties make no arguments about the first prong.

"implies that the employee has authority to make an independent choice, free from immediate direction or supervision," *id.* at § 541. 202(c), and "[i]n general, ... involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." *Id.* at § 541.202(a).

Both prongs use the term "primary duty." Determining an employee's "primary duty" under the regulations requires analysis of "all the facts in a particular case," looking to the "principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a); *Maestas v. Day & Zimmerman, LLC*, 664 F.3d 822, 829 (10th Cir. 2012).

With this legal background in mind, the Court holds that individual issues about the administrative exemption do not defeat class certification. The preponderance of the evidence shows that the CCs share similar primary job responsibilities. Regardless of a CC's title, Care CCs: (1) administer CNAs, (2) compile Care Plans, and (3) complete Touchpoints. *See*, *e.g.*, Evans Depo., Doc. 231-7 at 6; Falance Depo., Doc. 231-8, 3-4; Baros Depo., Doc. 231-9, 6; Gonzales Depo. 231-18, 4; Corbin Decl. ¶ 4, Doc. 231-30; Atencio Decl. ¶ 4, Doc. 231-29; Flores Decl. ¶ 4, Doc. 231-32. The declarant CCs claim that their job duties did not involve exercising clinical judgment or interpreting medical records, that they did not providing nursing or medical care, and that they did not formulate or administer management policies. *See* Atencio Decl. ¶¶ 5, 20; Corbin Decl. ¶¶ 5, 22; Herrera Decl. ¶¶ 5, 22; Flores Decl. ¶¶ 5, 22; Larrichio Decl. ¶¶ 13, 21; Montano Decl. ¶¶ 5, 21; Olloway Decl. ¶¶ 13, 22; Rodriguez Decl. ¶¶ 6, 22.

Defendants highlight alleged discrepancies among various CCs' testimony to argue that the administrative exemption is necessarily an individualized inquiry. According to Defendants, the record shows that some CCs exercised "discretion and judgment," while others "exercised no discretion at all and simply filled out forms on their computer." Doc. 245 at 28. The Court disagrees

that a highly individualized analysis is necessary to show the administrative exemption's application. While CCs' job duties certainly have some variation, it appears from the record, including the declarations offered by both parties, that most CCs perform similar duties. Defendants submitted declarations from a CC in the Transplant team who stated that she does not conduct CNAs, and a declaration from a former Level I CC who likewise stated that she did not conduct CNAs on nursing facility patients. Barnard Decl. ¶ 21, Doc. 245-16; Nielsen Decl. ¶ 16, Doc. 245-17. However, these differences do not overcome the overriding consistencies present throughout the whole record that CCs have similar primary responsibilities.

Additionally, the CC declarations submitted by Plaintiffs reflect that most of their time is spent producing CC Deliverables and that Presbyterian allegedly audited CCs' progress. *See*, *e.g*., Atencio Decl. ¶¶ 16, 18 ("As a Care Coordinator, I estimate that I spent well over 85-90% of my time each day on tasks required to produce CC Deliverables" which included "asking [patients] the questions on the CNA Questionnaire, filling out the drop-down boxes in the auto-generated Care Plan with information from the CNA, and completing Touchpoints in PHP's software," and that Presbyterian "constantly tracked, captured and monitored whether I produced CC Deliverables correctly and on schedule"); Flores Decl. ¶¶ 17, 19 (Care Coordinator IV stating that she spent 95% of her time producing CC deliverables and that Presbyterian constantly monitored her work).

Highly individualized inquiries into the administrative exemption therefore do not defeat class certification.

### ii. Defendants' Alleged Liability

Defendants next argue that "individual questions also dominate the second key issue presented by this case: whether Presbyterian is liable for overtime violations." Doc. 245 at 30. In other words, Defendants argue that individual determinations on the elements of Plaintiffs' MWA

cause of action will overwhelm other issues. To prove an MWA violation, Plaintiffs must prove: "(a) they worked more than forty hours a week, (b) that management knew or should have known that they did so, and (c) that they were not compensated for the overtime." *Self v. United Parcel Serv., Inc.*, 126 N.M. 396, 403, 970 P.2d 582, 589 (N.M. 1998). Defendants contend that individual issues predominate on all elements of Plaintiffs' MWA claim. They argue that there are no time records of the hours class members worked. They also point out that the FLSA opt-in members discovery responses reveal varying work hours, ranging from no overtime to fifty or more hours per week, suggesting that individual issues will predominate. Defendants contend that some supervisors were unaware that members of their teams were working overtime.

The Court finds that the Plaintiffs meet the predominance requirement with respect to their MWA cause of action. Although no employee punch cards appear to be in the cited record, Plaintiffs have submitted declarations that CCs worked over forty hours per week and were not paid additional wages. *See* Atencio Decl. ¶¶ 6-7; Corbin Decl. ¶¶ 6-7; Herrera Decl. ¶¶ 6-7; Flores Decl. ¶ 6-7; Larrichio Decl. ¶¶ 16-17; Montano Decl. ¶¶ 6-7; Olloway Decl. ¶¶ 16, 19; Rodriguez Decl. ¶¶ 7-8. In addition, Plaintiffs offer statements from Defendants' Rule 30(b)(6) witness and CCs managers that CCs and supervisors work between fifty and sixty hours per week, which tends to establish that management allegedly knew Plaintiffs worked overtime.[8] Therefore, Plaintiffs' MWA claim can be established through employee testimony, the testimony of Defendants' Rule 30(b)(6) witnesses and CCs managers, and Defendants' financial records, all of which is class-wide proof.

---

[8] Plaintiffs cite Ms. Hinton's statement, but the Court has not been able to find the underlying record and therefore does not consider Ms. Hinton's alleged statement.

The Court therefore finds that individual determinations as to each element of Plaintiffs' MWA cause of action will not overwhelm other issues.

### iii. Damages

Third and finally, Defendants contend that individual issues with respect to damages will predominate over common issues. They claim that "[t]here are no records that can establish how much overtime putative class members purportedly worked, so there is no way to calculate damages owed to individual putative class members or to the class as a whole." Doc. 245 at 32.

But "courts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations." *Menocal*, 882 F.3d at 922–23. At the class certification stage, a plaintiff is not required to demonstrate through common evidence the precise amount of damages incurred by each class member. *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 252 (D.C. Cir. 2013) (citation omitted). If, as here, "the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013). The Court therefore does not agree with Defendants that individual issues with respect to damages will predominate over common issues.

In summary, the Court concludes that Plaintiffs have satisfied Rule 23(b)'s predominance component.

### B) Superiority

In addition to demonstrating the predominance of common questions, Plaintiffs must also demonstrate that resolution of the issues on a class-wide basis is superior to other available

methods for the fair and efficient adjudication of the controversy. In making this assessment, the Court should consider (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions, (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class, (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum, and (d) the likely difficulties in managing a class. Fed. R. Civ. P. 23(b)(3). Defendants dispute factors (a) and (d).

Because the MWA allows for treble and other damages, Defendants argues that this is not a small-value case. *Cf. Amchem Products*, 521 U.S. at 617 (explaining that "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.") (citation omitted). Defendants therefore argue that individuals who worked over forty hours per week would be highly motivated to proceed individually without their claims "be[ing] diluted by lower-value claims of other putative class members … who report working at most 40-42 hours per week." Doc. 245 at 37 (quotation marks omitted). Defendants also argue that proceeding individually would also benefit those members who "likely have no interest in challenging their MWA exemption status" because they allegedly "do not wish to be paid on an hourly basis and feel fairly compensated." *Id.*

But as Plaintiffs correctly point out, "the potential for greater recovery in individual suits … does not mean a class action is inferior to individual actions because potential plaintiffs may be unaware of their right[s], or otherwise uninclined, to bring such an action." *Lawrence v. First Fin. Inv. Fund V, LLC*, 336 F.R.D. 366, 385 (D. Utah 2020) (citation and quotation marks omitted). Moreover, "any plaintiff who wishes to do so can opt out of this action and file separately." *Id.*

The Court thus finds that "[t]he interest of the class as a whole to litigate the predominant common questions substantially outweighs any interest of individual members to bring and prosecute separate actions." *Felps*, 336 F.R.D. at 679.

Defendants also argue that managing a class would be difficult. They say that manageability issues are "concerning" given Plaintiffs' strategy to maintain a FLSA collective and an MWA class action. "If anything," Defendants argue, "Plaintiffs' own carving up of the putative class demonstrates that a class action is not superior to individual actions." Doc. 245 at 38. And they state that that Plaintiffs "have offered no trial plan, no discovery plan, and no methodology to prove claims without individualized discovery." *Id*.

The Court holds that alleged class management issues do not defeat certification. Plaintiffs propose a class composed of about 700 members. "Given the relatively small size of the putative class and its discrete geographical location, the Court does not foresee manageability issues precluding certification." *Rodriguez,* 2020 WL 3000415, at *18; *see also Felps*, 336 F.R.D. at 680 (same); *Jacob*, 289 F.R.D. at 423 (finding that a class was manageable where it "constitutes[d] fewer than 1,000 putative members, and [was] concentrated in a single, geographic area, rather than spanning the nation").

Defendants also fault Plaintiffs for maintaining a FLSA collective and an MWA class action. But Defendants have cited no authority that such a strategy is impermissible or should defeat certification. Indeed, caselaw suggests the opposite. *See Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013) ("joining a collective action and a class action or actions in one suit, as in this case, is both common and, we have held, permissible") (citation omitted); *Rodriguez*, 2020 WL 3000415, at *17 (noting that parallel MWA and FLSA actions did not defeat class certification). The Court also fails to see how an alleged lack of a trial plan, discovery plan,

and methodology to prove claims defeats certification. Concerning a trial plan specifically, Defendants "identif[y] no Tenth Circuit authority requiring a trial plan." *Kunneman Properties, LLC v. Marathon Oil Co.*, No. 17-CV-456-GKF-JFJ, 2022 WL 1766925, at *13 (N.D. Okla. Mar. 31, 2022). They likewise identify no binding authority requiring a discovery plan or methodology at this stage.

But even if these issues—a parallel FLSA action and lack of a trial, discovery, and damages calculation plan—do become problematic, the better answer is to revisit them later rather than deny Plaintiffs' class certification motion. *See Rodriguez*, 2020 WL 3000415, at *17 ("[R]ather than deny Mr. Rodriguez's motion for class certification, the Court instead will reconsider and decertify the class if there is real evidence that maintenance of this lawsuit as a class action is neither sensible nor superior given the presence of [a parallel] FLSA action"); *Lavigne v. First Cmty. Bancshares, Inc.*, No. 1:15-CV-00934-WJ/LF, 2018 WL 2694457, at *9 (D.N.M. June 5, 2018) ("If it becomes apparent later in this litigation that the class is not administratively feasible or individual issues predominate, the parties may file motions for appropriate relief, such as a motion to decertify or modify the class."); *Boughton v. Cotter Corp.*, 65 F.3d 823, 826 (10th Cir. 1995) (describing the district court's broad discretion at the class certification stage).

In summary, Plaintiffs have satisfied the superiority element of the Rule 23(b)(3) analysis and all other Rule 23 elements. Plaintiffs' motion for class certification is granted.

**II.**     <u>**DEFENDANTS' MOTION TO DECERTIFY THE FLSA COLLECTIVE**</u>

**A. ADDITIONAL BACKGROUND**

As noted earlier, in November 2020, the Court conditionally certified the following FLSA

collective class action (the "FLSA Collective"):

> Individuals employed by Defendants in CCE Job Titles in the last three years who
> were paid on a salary basis and treated by Defendants as exempt from state and
> federal overtime laws.

Doc. 16; Do. 47. Plaintiffs' counsel sent notice to 723 current and former Presbyterian employees

who satisfied the collective-action class definition. Doc. 233 at 10. Fewer than 10%, or 71

individuals, joined the collective action. *Id*.

On January 31, 2022, Plaintiffs filed their operative Third Amended Class and Collective

Action Complaint (Doc. 142) that "splits the class allegations into two narrower subclasses—one

for Care Coordinators and one for Utilization Management Nurses." Doc. 242, 6. In their response

brief to Defendants' motion for decertification, Plaintiffs "request that the Court deny

decertification and divide the [FLSA Collective] into the following" two subclasses:

> Care Coordinator Subclass ("CC Subclass"): Current and former Care Coordinators
> employed by Defendants in New Mexico who performed work pursuant to
> Defendant Presbyterian Health Plan, Inc.'s contract with the New Mexico Human
> Services Department from July 11, 2016 to the final date of judgment. The terms
> "Care Coordinators" or "CCs" refer to individuals employed by Defendants in the
> Care Coordinator I, Care Coordinator II, Care Coordinator III, or Care Coordinator
> IV positions in New Mexico who were paid on a salary basis, but does not include
> individuals employed as Care Coordinators on Defendants' Transition of Care
> team, Critical Incident team, or DSNP Level 1 Care Coordinators.
>
> Utilization Management Subclass ("UM Nurse Subclass"): All individuals
> employed by Defendants in New Mexico in the Utilization Management Nurse and
> Utilization Management Nurse Specialist positions who were paid on a salary basis
> and classified as exempt from overtime from July 11, 2016 to the final date of
> judgment ("UM Nurses").

*Id*. at 7 (bold font and footnote omitted).

The two subclasses encompass 61 of the 63 Plaintiffs and Opt-in Plaintiffs. *Id*. Fifty-five

of these individuals worked for Presbyterian as CCs, Levels I–IV and six individuals worked in

the position of Utilization Management Nurse and/or Utilization Management Nurse Specialist.

*Id*. at 7–8.

Plaintiffs inform the Court that they "do not oppose decertification with respect to two

remaining opt-in plaintiffs: Jermona Ellis, the only opt-in who worked in the LTC UM Reviewer,

and Christine Montoya, the only opt-in who worked as a Care Coordinator on the Transition of

Care Team." *Id*. at 8.

## B. LEGAL STANDARDS

The FLSA requires employers to pay covered employees who work longer than 40 hours

in a given workweek "at a rate not less than one and one-half times the regular rate at which [the

employee] is employed." 29 U.S.C. § 207(a)(1). Section 207's mandate does not, however, apply

to "any employee employed in a bona fide executive, administrative, or professional capacity[.]"

*Id*. § 213(a)(1). Pursuant to § 29 U.S.C. § 216(b), one or more employees may pursue an action in

a representative capacity for other "similarly situated" employees. Potential class members who

are similarly situated to the named plaintiff "opt in" to the case. *See id*. The purpose of an FLSA

collective action is to give "plaintiffs the advantage of lower individual costs to vindicate rights

by the pooling of resources," and to benefit the judicial system "by efficient resolution in one

proceeding of common issues of law and fact arising from the same alleged ... activity." *Hoffmann-*

*La Roche Inc. v. Sperling*, 493 U.S. 165, 170, 110 S. Ct. 482, 485, 107 L. Ed. 2d 480 (1989).

The Tenth Circuit Court of Appeals has approved of a two-tiered, "ad hoc" approach to

determine whether named and prospective plaintiffs are "similarly situated" such that certification

is proper. *See Thiessen v. General Elec. Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001).

During the initial "notice stage," courts require only "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." *Id.* "At the conclusion of discovery (often prompted by a motion to decertify), the court then makes a second determination, utilizing a stricter standard of 'similarly situated.'" *Id.*

During this second-stage analysis, the court assesses several factors, including "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations …." *Id.* at 1103 (footnote omitted). Plaintiffs bear the burden of establishing that they are similarly situated. *Eagle v. Freeport-McMoran, Inc.*, No. 2:15-CV-00577-MV-SMV, 2016 WL 7494278, at *2 (D.N.M. Aug. 3, 2016) (citing *Montoya v. Rescue Indus., Inc.*, No. 98-1269, 1999 WL 240247, at *1 (10th Cir. Apr. 20, 1999) (Table)).

## C. DISCUSSION

Before addressing the *Thiessen* factors, the Court must first address whether Plaintiffs may narrow the FLSA Collective into two subclasses that exclude Opt-in Plaintiffs Jermona Ellis and Christine Montoya. The Court concludes that Plaintiffs may do so. The Court will then consider the three *Thiessen* factors on the merits. That analysis shows that decertification is not warranted.

### 1. Plaintiffs' Proposed Subclasses and Dismissing Opt-in Plaintiffs

Defendants argue that no court has allowed "certifying new, never-before-certified collectives that exclude opt-in Plaintiffs …." Doc. 253 at 20. "Courts … only consider previously-certified subclasses," according to Defendants, and the creation of subclasses would result in excluding the two Opt-in Plaintiffs. *Id.* The Court disagrees with Defendants that it cannot approve a FLSA collective action divided into subclasses that do not include the two Opt-in Plaintiffs. As a general matter, "[i]t is within the Court's discretion to clarify and narrow the proposed class …

to ensure that the certified class is consistent with the purposes and requirements of the FLSA." *Burch v. Qwest Commc'ns Int'l, Inc.*, 677 F. Supp. 2d 1101, 1122-23 (D. Minn. 2009). And, "[i]f some opt-in plaintiffs are not situated similarly to the lead plaintiff, the most efficient course may be to grant the defendant's de-certification motion in part, dismiss the non-conforming opt-in plaintiffs' claims without prejudice and narrow the scope of the FLSA collective action." [9] *Hill v. R+L Carriers, Inc.*, No. C 09-1907 CW, 2011 WL 830546, at *4 (N.D. Cal. Mar. 3, 2011); *see also Dang v. Inspection Depot, Inc.*, 2015 WL 11598702, at *3 (S.D. Fla. Nov. 6, 2015) (dismissing certain plaintiffs from a FLSA collective action at the decertification stage); *Dice v. Weiser Sec. Servs., Inc.*, No. 06-61133-CIV, 2008 WL 249250, at *1 (S.D. Fla. Jan. 29, 2008) (creating a subclass rather than decertifying a FLSA collective class because the "creation of such a subclass would best serve considerations of convenience, cost, judicial economy, and expeditious trial process"); *Rawls v. Augustine Home Health Care, Inc.*, 244 F.R.D. 298, 302 (D. Md. 2007) (sub-dividing a certified FLSA collective class into four distinct subclasses based on where they worked at the decertification stage).

The Court uses its discretion to dismiss the claims of the two Opt-in Plaintiffs at the decertification stage. While Defendants argue that no court has ever certified "new, never-before-certified collectives," that excludes certain opt-in plaintiffs, Defendants have pointed to no authority that Plaintiffs' proposed course of action is prohibited. Doc. 253 at 20. The Court will therefore adopt Plaintiffs' proffered subclasses and dismiss without prejudice Opt-in Plaintiffs Jermona Ellis and Christine Montoya.[10]

---

[9] Plaintiffs do not argue that the two Opt-In Plaintiffs are not similarly situated to the lead Plaintiffs so the Court will not consider the issue.

[10] According to Defendants, the two Opt-in Plaintiffs are subject to the voluntary dismissal requirements of Federal Rule of Civil Procedure 41(a)(2), which asks whether Defendants "will suffer prejudice …." as a result of the dismissals. *Clark v. Tansy*, 13 F.3d 1407, 1411 (10th Cir.

### 2. Application of the *Thiessen* Factors

The Court next assesses: (1) the disparate factual and employment settings of CCs and UM Nurses; (2) the various plaintiff-focused defenses,  and (3) fairness and procedural considerations. *See Thiessen*, 267 F.3d at 1103.

### A) Factual and Employment Settings of the Individual Plaintiffs

The first *Thiessen* factor does not require a plaintiff to establish "that the opt-ins are *identically* situated." *Levine v. Vitamin Cottage Nat. Food Mkts., Inc.*, No. 20-CV-00261-STV, 2023 WL 3648684, at *5 (D. Colo. May 25, 2023) (citation omitted). "Instead, courts have permitted FLSA claims to proceed collectively when disparities among the opt-in plaintiffs are 'not material' and are 'outweighed by the similarities between those [p]laintiffs.'" *Id.* (citation omitted).

### i. The CC Subclass Members Are Sufficiently Similar

Defendants argue that members of each subclass (the CC Subclass and the UM Nurse Subclass) perform different duties. As for the CC Subclass members, Defendants argue that they,

> performed different duties: some conducted comprehensive needs assessments, developed care plans with their members, and performed duties specific to their members' needs, like research and advocacy, but others insisted they did not. They also performed duties differently from one another: some used their judgment to perform assessments, prepare care plans, and monitor care progress, but others did not. And they were supervise[d] differently, too: some had mandatory weekly meetings or had to check in when they left their desk, but others did not.

---

1993). "Although the FLSA provides a mechanism to join the collective action, it does not explicitly provide a method whereby an opt-in plaintiff may unilaterally withdraw once they have joined the litigation." *Duke v. Harvest Hosps., Inc.*, No. 2:20-CV-00865-CCW, 2021 WL 4245089, at *2 (W.D. Pa. Sept. 17, 2021) (citation, footnote, quotation omitted).  The Tenth Circuit has not directly addressed this issue, and Defendants have not cited to any binding authority which would require the decertification of the subclasses here due to the necessary dismissal of two of the Opt-in Plaintiffs.  To preserve the rights of the two Opt-in Plaintiffs, the Court believes the prudent course is for Plaintiffs submit, within seven days of entry of this Memorandum Opinion and Order, a proposed tolling order addressing Opt-in Plaintiffs Ellis and Montoya.

Doc. 253 at 7 (citations, footnote, and underlining omitted).

In analyzing the first *Thiessen* factor, the Court incorporates its Fed. R. Civ. P. 23 analysis, *see Golden*, 2023 WL 3182645, at *13, and holds that the first factor weighs in Plaintiffs' favor. As the Court has already described at some length, CCs have similar job duties. In addition, they are governed by the HSD contract, use the same standardized tools and software, are subject to the same supervision and auditing, receive the same training, and allegedly were subjected to the same uniform practice affecting the entire class similarly, making collective treatment appropriate notwithstanding the differences Defendants identify. *See Valencia v. Armada Skilled Home Care of NM LLC*, No. 118CV01071DHUJFR, 2023 WL 1993869, at *3 (D.N.M. Feb. 14, 2023) (denying motion to decertify FLSA collective class where the members "share[d] largely similar factual and employment settings because they all worked from the same centralized office under the same management, share[d] the common duty of providing home health care services, [were] classified as 'non-exempt,' were paid on the same 'per event' basis, and used the same electronic system to record their work time") (citation omitted).

The Court therefore holds that members of the CC Subclass had sufficiently similar job duties to defeat decertification.

### ii.  The UM Nurse Subclass Members Are Sufficiently Similar

Presbyterian and/or Fluent employ UM Nurses to conduct "[a] formal evaluation of the coverage, medical necessity, efficiency or appropriateness of health care services and treatment plans." Doc. 243-1, 22; Doc. 242 at 22. The National Committee for Quality Assurance ("NCQA"), an accrediting organization, sets industry standards for managed care organizations' performance of utilization management services. Cunico Dep., Doc. 243-1, 40. Insurance benefits requests must be reviewed in an objective and consistent manner. *Id*. at 53; Doc. 242 at 23. Under

the HSD Contract, Defendants are required to use clinical guidelines when reviewing insurance coverage for medical services. Cunico Dep., Doc. 243-1 at 53.

When an insurance coverage request is sent to Presbyterian, it not assigned based on the patient's particular insurance plan. Doc. 242 at 24. Instead, incoming requests go into a queue and are automatically assigned to the next UM nurse in a line. *Id.* To determine whether a medical service is covered, a UM Nurse will compare the request to a set of pre-determined medical necessity criteria. Doc. 243-1 at 23. If the criteria are met, the request can be approved; if not, the UM Nurse may issue an administrative denial of coverage unless the requestor feels that a medical necessity exists. *Id.*

If a patient's coverage request does not meet UM guidelines or clinical criteria, then the UM Nurse must escalate the request to a medical director for final approval. *Id.* Only a medical doctor can deny the request. Pruess Dep., Doc. 243-1, 88. While the clinical guidelines must be considered, UM nurses uses the same software, Jiva, to route authorizations. Wood Dep., Doc. 243-1, 85.

While some UM Nurses are Registered Nurses ("RNs") and others are Licensed Practical Nurses ("LPNs"), UM Nurses perform the same job duties regardless of licensure. Cunico Dep., Doc. 243-1 at 52. Although they are nurses, they do not provide medical care to patients, order or diagnose treatments, modify doctors' orders, or physically touch patients. *Id.* at 50. UM Nurses attend a long orientation, regardless of whether the individual is an LPN or RN. *Id.* at 55. They are also subject to a "UM New Employee Performance Checklist Competency." Pls.' Ex. 6, 13. UM Nurses also complete ongoing training through the year, including monthly meetings. Cunico Dep., Doc. 243-1 at 56.

Presbyterian follows NCQA standards for compliance on timely UM decisions. Doc. 244-1, 17. UM Nurses are subject to timeframes, and they lack authority to change those timeframes. Romero Dep., Doc. 243-1, 70. In addition, UM Nurses are subject to audits of the utilization review process to ensure their decisions are accurate, that their work is quality-level, and that they are complying with regulatory obligations. *Id*. Monitoring occurs daily. *Id*. at 72. In addition, they must complete yearly Inter-Rater Reliability tests to ensure consistent application of medical necessity guidelines across UM Nurses. *Id*. at 73.

Here, Defendants argue that UM Nurses reviewed requests of differing complexity, so they necessarily exercised "different degrees and kinds of discretion of judgment." Doc. 253 at 14. However, the record shows that UM Nurses are required to follow Defendants' policies and procedures, regardless of the type or complexity of the authorization request. While the nature of each request necessarily differed, the overall process of comparing the request to a set of pre-determined medical necessity criteria did not. UM Nurses operate under the same clinical guidelines, and the scope on their authority to deny requests is the same. They use the same software to route authorizations, and they perform the same job duties regardless of their licensure. They are subject to the same performance evaluations, timelines, and quality control. Defendants also point out that they were subjected to different levels of supervision. Be that as it may, this individual variation is not enough to outweigh the overall similarities in job duties. Plaintiffs have therefore shown that UM Nurses' job duties are sufficiently similar.

Defendants also argue that Plaintiffs' discovery materials "reveal numerous credibility issues" such that there will be "mini-trials" to resolve each individual's claim. Doc. 233 at 25, 26. For example, they argue that there are contradictions between certain Plaintiffs' declarations and deposition testimony and/or interrogatory responses; that other individual "disavow[ed] their own

resumes or … self-evaluations"; and that "several Plaintiffs' employment records show that Presbyterian terminated their employment relationship for falsifying documentation." *Id*. at 26. Defendants therefore suggest that "cross-examination of each plaintiff" and "the need for separate mini-trials to resolve each individual's claim," will be necessary. *Id*. at 25.

In support of their arguments, Defendants allege contradictions between  UM Nurses' testimony and their written statements. However, even if such discrepancies exist, the current record shows that Plaintiffs are overall similarly situated on many of the fact-specific issues that can be developed through common testimony from the Plaintiffs regarding their daily responsibilities and duties. "The Defendants will receive latitude" at trial to introduce evidence of alleged discrepancies. *Medrano v. Flowers Foods, Inc.*, No. CV 16-350 JCH/KK, 2021 WL 3290711, at *6 (D.N.M. Aug. 2, 2021). At this stage, however, the similarities of the Opt-in Plaintiffs weigh against decertification.

In summary, the first *Thiessen* factor weighs in Plaintiffs' favor.

### B) Individual Defenses

"The second [*Thiessen*] factor inquires as to whether there exist defenses that need to be litigated on an individual basis." *Brayman v. KeyPoint Gov't Sols., Inc.*, 595 F. Supp. 3d 983, 994 (D. Colo. 2022), *rev'd on other grounds by* 83 F.4th 823 (citation omitted). A court has discretion to decertify a FLSA collective class when "individualized defenses inhibit the efficiency of proceedings on a collective basis." *Nez v. Sw. Glass & Glazing, Inc.*, No. 1:15-CV-01041-RJ, 2016 WL 10516171, at *4 (D.N.M. Dec. 22, 2016) (citation omitted). Defendants argue that individual questions dominate regarding: (1) the administrative exemption defense, (2) which employees worked over forty hours per week, (3) Presbyterian's good-faith defenses. The Court addresses each argument.

### i. The Administrative Exemption

Defendants claim that individual questions dominate the administrative exemption defense. They claim that an employee-by-employee analysis will be required because of "the disparities within and among the opt-in's discovery responses and deposition testimonies …." Doc. 233 at 34 (citation omitted). Plaintiffs, on the other hand, argue that the administrative exemption defense would "apply equally to all members of each Subclass." Doc. 242 at 30.

The Court holds that individual questions concerning the administrative exemption do not require decertification. "[A]t the decertification stage, the overarching issue is 'whether common questions of law and fact exist that justify representational litigation.'" *Valencia*, 2023 WL 1993869, at *4 (quoting *Medrano*, 2021 WL 3290711, at *5). With respect to CCs, the record shows that they share similar primary job responsibilities: administering CNAs, compiling Care Plans, and completing Touchpoints. Several CCs submitted declarations explaining that their job duties did not involve exercising clinical judgment or interpreting medical records, providing medical care, or making policy recommendations. "Just because the [administrative exemption defense] inquiry is fact-intensive does not preclude a collective action where plaintiffs share common job traits." *Morgan v. Fam. Dollar Stores, Inc.*, 551 F.3d 1233, 1263 (11th Cir. 2008). The Court concludes that CCs are similarly situated on many of the fact-specific issues that must be addressed at a trial on the merits.

With respect to the UM Nurses, the Court also holds that common questions of law and fact exist that justify representational litigation. As noted earlier, a UM Nurse will assess a request for coverage by judging it against certain criteria and they use the same software to route authorizations. They do not provide medical care to patients, and they perform the same job duties regardless of licensure. They are subject to the same or similar training, audits, and performance

expectations. As with the CCs, the Court holds that common questions of law and fact justify collectively litigating whether the administrative exemption applies.

Finally, the administrative exemption defense is not unique to a specific plaintiff, whether UM Nurse or CC. Instead, Defendants "are raising the … exemption defense against all" and therefore a "collective forum will not prevent Defendants from asserting the defense." *Medrano*, 2021 WL 3290711, at *5; *cf. Nez*, 2016 WL 10516171, at *4-5 (decertifying an "unmanageable" FLSA collective class action where defendants did not "put[ ] forth one common defense that applies across the board"). "Decertification would only require the court to apply the [administrative] defense in … separate trials, which would not promote efficiency." *Medrano*, 2021 WL 3290711, at *5.

### ii. Determining Alleged Overtime Hours

Defendants next argue that individualized inquires will be required on which employees, if any, worked overtime. *See Rindfleisch v. Gentiva Health Servs., Inc.*, 22 F. Supp. 3d 1295, 1303 (N.D. Ga. 2014) ("[T]he fact that some Plaintiffs did not actually work overtime hours, creates a disparate factual setting among the individual Plaintiffs as the issue of liability is not susceptible to common proof."). Defendants argue that Plaintiffs lack timestamp data and/or representative testimony of hours worked, and that some Plaintiffs are not credible.

The Court believes that Defendants' arguments lack grounding in the record. First, Defendants argue that Plaintiffs cannot rely on timestamp data produced in discovery because that data is inaccurate, meaning individual inquiries are necessary. As support, Defendants rely on "App'x A" and "App'x B", which are two appendices to Defendant's motion (totaling 74 pages) that Defendants prepared for litigation. However, for the reasons stated in the Court's March 28,

2024 Memorandum Opinion and Order (Doc. 278), these appendices have been struck from the record and will not be considered by the Court.

Second, Defendants rely on the deposition testimony of two plaintiffs, Christine Montoya and Norma Calix-Garcia, to argue that individuals did not work overtime or did so for a short time. However, the testimony of these two individuals is more ambiguous than Defendants acknowledge. Ms. Montoya stated in her testimony that she did not have "concerns about the hours [she was] working" nor did she "fe[el] like [she was] working too many hours." Montoya Dep., Doc. 233-27. As for Ms. Calix-Garcia, when asked how many hours she currently worked, she answered "because it's super busy the past couple weeks maybe I'm working, like, 42 hours, but lately it's 40 hours." Calix-Garcia Dep. Doc. 233-36.

The Court believes that these statements are insufficient to draw the inference that Plaintiffs are not sufficiently similarly situated. Ms. Montoya may not have felt concerned about working too many hours. But that is not to say she did not work overtime. And although Defendants claim that Ms. Calix-Garcia's testimony shows she worked 42 hours at the "busiest" time, but otherwise "usually worked only 40 hours," the fact remains that she testified to working over 40 hours per week. Doc. 233 at 39.

Third, Defendants argue that many Plaintiffs' credibility is at issue because they claimed to work certain hours in discovery response, but then described different work hours when deposed. But as Defendants acknowledge, Plaintiffs' counsel attempted to correct these discrepancies by amending their interrogatory responses. Defendants imply that "the frequency of those corrections suggests that the responses of Plaintiffs who were not deposed are unreliable evidence of hours worked." *Id*. at 40. However, this is speculation by Defendants, and the Court will not decertify a collective class action based on such speculation.

Fourth and finally, Defendants point to evidence that does tend to show that one CC, Michael Luna, could not have worked overtime because he was on a lengthy medical leave before being separated. Docs. 233-6, 233-7. However, that one Opt-in Plaintiff allegedly did not work overtime should not defeat certification.[11] "[A] collective action does not necessitate that 'there be no differences among class members,' and nor does it prohibit individualized inquiries 'in connection with fashioning the specific relief or damages to be awarded to each class member.'" *Brayman*, 595 F. Supp. 3d at 994 (citation omitted); *Medrano*, 2021 WL 3290711, at *6 (D.N.M. Aug. 2, 2021) ("individualized inquiries into the number of uncompensated hours worked do not warrant decertification"). The Court holds that potential differences in work hours does not require decertification of this action.

### iii. Good Faith Defense

Defendants argue that Plaintiffs "are not similarly situated as to Presbyterian's good faith defense." Doc. 233 at 40. An employer who violates the FLSA is liable for unpaid wages plus an equal amount of liquidated damages. *See* 29 U.S.C. § 216(b). However, courts may reduce or deny liquidated damages if the employer shows its actions were taken in good faith and that it had reasonable grounds to believe its actions would not violate the FLSA. *See* 29 U.S.C. § 260; *Pabst v. Oklahoma Gas & Elec. Co.*, 228 F.3d 1128, 1136 (10th Cir. 2000). "The good faith requirement mandates the employer have 'an honest intention to ascertain and follow the dictates of the Act.'" *Dep't of Lab. v. City of Sapulpa, Okl.*, 30 F.3d 1285, 1289 (10th Cir. 1994) (citation omitted).

Defendants state that Presbyterian, "through different internal Compensation Department employees and in consultation with different business leaders, made at least seven relevant

---

[11] Although not mentioned by the parties, the Court notes that Mr. Luna withdrew his consent form in June 2023, *see* Doc. 235, which further undermines Defendants' arguments because Mr. Luna is no longer even a FLSA opt-in plaintiff.

classification decisions." Doc. 233 at 40. They argue that determining Presbyterian's good faith will require "the factfinder to consider factors unique to each [of the seven] classification decisions." *Id.* Plaintiffs respond that "Defendants' interrogatory answers show that Defendants classified all [CCs] (except [CC I's] as exempt at the same time, as a group. The same goes for UM Nurses. Thus, whether Defendants acted in good faith can be resolved collectively with respect to each Subclass." Doc. 242 at 38.

The parties genuinely dispute whether Presbyterian classified its employees as a single group, or over whether it made several classification decisions over many years. Despite this dispute, however, decertification is not warranted. Whether Defendants' § 260 defense applies is a relatively discrete and straightforward issue. "[C]reating multiple lawsuits to reach an answer," is not the answer. *Medrano*, 2021 WL 3290711, at *5. At trial, Defendants are "free to present evidence of [their good faith], to cross-examine representative Plaintiffs, and to call to the stand others with material testimony that helps its case." *Brayman*, 595 F. Supp. 3d at 994–95. The Court concludes that Defendants' good faith defense does not require decertification.

In summary, the Court holds that the second *Thiessen* factor weighs in Plaintiffs' favor.

### C) Fairness and Procedural Considerations

Finally, the Court evaluates and fairness and procedural concerns. In evaluating this factor, the Court considers the FLSA's "important remedial purpose: (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." *Id.* at 995; *Nez*, 2016 WL 10516171, at *5.

Defendants argue that decertification is required because "individual Plaintiffs' testimony conflicts not only with their written statements, but also with the testimony of their peers" such

that "[i]ndividual Plaintiffs who cannot speak credibly about their own experiences surely cannot speak to the experiences of their peers." Doc. 233 at 41. They further argue that "there are too many legal and factual questions that cannot be determined on a representative basis." *Id.*

However, fairness and procedural considerations support certification when "the members of the collective share a common issue: whether [Defendants] failed to compensate [Plaintiffs] for all overtime worked." *Brayman*, 595 F. Supp. 3d at 995. According to Plaintiffs, there are 55 CCs in the CC Subclass and six UM Nurses in the UM Nurse Subclass. Certification would therefore "significantly reduce the costs of litigation to members of the class and entitle members of the class to have their claims heard in an efficient and cost-effective manner." *Id*. Defendants also argue that trying potentially three distinct cases (the CC FLSA collective class action, the UM Nurses FLSA collective class action, and the Rule 23 class action) would be inefficient. However, judicial economy certainly does not favor trying the claims of at least 61 individuals in distinct and separate actions, which is what Defendants seem to propose.

In summary, because the three *Thiessen* factors weigh in Plaintiffs' favor, Defendants' motion to decertify is denied.

## **ORDER**

For these reasons explained herein, and based on the pleadings, oral argument, and evidence, **IT IS HEREBY ORDERED** that:

1.      Plaintiffs' Motion for Class Certification under Federal Rule of Civil Procedure 23 (Doc. 230) is **GRANTED**. The Court certifies the following class pursuant to Fed. R. Civ. P. 23(b)(3):

> All current and former Care Coordinators employed by Defendants in New Mexico who performed work pursuant to Defendant Presbyterian Health Plan, Inc.'s contract with the New Mexico Human Services Department from February 1, 2013, to the final date of judgment (the "Class"). The terms "Care Coordinators" or "CCs"

refer to individuals employed by Defendants in the Care Coordinator I, Care Coordinator II, Care Coordinator III, or Care Coordinator IV positions in New Mexico who were paid on a salary basis, but does not include individuals employed as Care Coordinators on Defendants' Transition of Care team, Critical Incident team, or DSNP Level 1 Care Coordinators.

    a) The Law Firm of Werman Salas P.C. is appointed Class Counsel.

    b) The parties shall submit a Joint Proposed Class Notice within 14 days of the date of this Order.

2.    Defendants' Motion to Decertify Fair Labor Standards Act Conditional Collective (Doc. 233) is **DENIED**.

3.    Plaintiffs' requested subdivision of the FLSA Collective, as moved for in Plaintiffs' Response to Defendants' Motion to Decertify Fair Labor Standards Act Conditional Collective (Doc. 242) is **GRANTED**. The Court subdivides the FLSA Collective into the following two subclasses:

Care Coordinator Subclass ("CC Subclass"): Current and former Care Coordinators employed by Defendants in New Mexico who performed work pursuant to Defendant Presbyterian Health Plan, Inc.'s contract with the New Mexico Human Services Department from July 11, 2016 to the final date of judgment. The terms "Care Coordinators" or "CCs" refer to individuals employed by Defendants in the Care Coordinator I, Care Coordinator II, Care Coordinator III, or Care Coordinator IV positions in New Mexico who were paid on a salary basis, but does not include individuals employed as Care Coordinators on Defendants' Transition of Care team, Critical Incident team, or DSNP Level 1 Care Coordinators.

Utilization Management Subclass ("UM Nurse Subclass"): All individuals employed by Defendants in New Mexico in the Utilization Management Nurse and Utilization Management Nurse Specialist positions who were paid on a salary basis and classified as exempt from overtime from July 11, 2016 to the final date of judgment ("UM Nurses").

4.    Within seven days, Plaintiffs shall submit a proposed Equitable Tolling Order as to the two Opt-in Plaintiffs referenced in the above Order.

**IT IS SO ORDERED**.

_____
HON. DAVID HERRERA URIAS
UNITED STATES DISTRICT JUDGE